**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 31, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-50351

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

LONNIE JEARL PAYNE,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before DUHÉ, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DUHÉ, Circuit Judge:

Defendant Lonnie Jearl Payne (Payne) appeals his convictions for knowingly receiving child pornography in violation of 18 U.S.C. § 2252A and for possessing a firearm in violation of 18 U.S.C. § 922(g)(1). Specifically, Payne appeals the district court's denial of his motion to suppress and contends that he was prejudiced by duplicity in Count Three of his indictment. Payne also challenges the sufficiency of the evidence supporting his conviction for receiving child pornography. We affirm.

I. FACTUAL AND PROCEDURAL HISTORY

The events leading to Payne's arrest began with the interview of seventeen-year-old Starla Nickels by Investigator Reba Beam of the Midland County Sheriff's Office. During the interview, Nickels reported that she had been bonded out of jail by Lonnie Payne, the owner of Midland Bail Bonds. Because she had no money, Payne required Nickels to pose for nude pictures and have sex with him in lieu of the bond fee. Payne later told Nickels he had posted the nude pictures of her on a sexually explicit website. During another encounter, Payne displayed on his office computer sexually explicit pictures of women and advised Nickels that she should imitate the women's poses the next time he photographed her. Payne also tried to convince Nickels to work in a strip club, offering her alcohol to overcome her reluctance, and explaining that he could get her a job at the club despite her being underage because he knew the owners.

Investigator Beam pursued the investigation with FBI Special Agent David Sutherland and Detective Sheldon Johnson, the primary child pornography investigator for Midland. The investigators searched the trash outside Payne's bail bond office and discovered photographs of unidentified adult women, one of whom was in a "sexy" pose. They interviewed Tracy Massingill, who had introduced Nickels to Payne, and who reported that she, too, had sex with Payne in exchange for a bail bond.

Agent Sutherland was the FBI agent assigned to investigate

2

child pornography and sexual exploitation cases in Midland; however, this case was his first experience investigating child sexual exploitation. He used a form supplied by Detective Johnson, who was experienced in child pornography investigations, to draft the affidavit supporting his request for a search warrant.[1]

_____

[1] The affidavit, written and signed by Agent Sutherland, stated:

I, David M. Sutherland, Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state:

1. I have been employed as a Special Agent with the FBI since March 1999. I am assigned to the Midland, Texas Resident Agency and tasked with the responsibility of investigating child pornography and the sexual exploitation of children. I am currently assigned to the investigation of Lonnie Jearl Payne on the accusation that he has engaged in, received, promoted, produced, and distributed child pornography in violation of Title 18, United States Code, section 2251, Sexual Exploitation of Children and Title 18, United States Code, Section 2252 and 2252(a), Certain Activities Related to Material Involving the Sexual Exploitation of Minors.

2. The information contained herein is based upon my own investigation and the investigation of the Midland County Sheriff's department and the Midland police department.

3. Starla Kay Nickels, age 17, was arrested for credit card abuse by the Midland County Sheriff's Office on 19 April 2000 and was held on a $2000 bond. While in being (sic) detained at the Midland County Detention Center, Nickels spoke with Tracy Lynn Massingill. Nickels told Massingill that Nickels had no money or family to supply the bond. Massingill told Nickels that Payne could get Nickels her bond but that Nickels would probably have to engage in sexual relations with Payne. Massingill called Payne from the Midland County Detention Center and introduced Nickels to Payne over the telephone.

4. Massingill had previously used Payne's bond service in October 1997. At the time of her release Payne brought Massingill to his offices at 1301 East Front Street, Midland, Texas and engaged in sexual intercourse with Payne. Payne did not charge Massingill any fee for her bond.

5. Massingill had learned of Payne while in jail from another female inmate who told Massingill that Payne would get her out if Massingill would have sex with Payne. That female inmate called Payne and introduced Massingill to Payne over the telephone.

6. On 05 May 2000 Payne arranged for Nickels release and transportation to his office at 705 #3 West Indiana, Midland, Texas. Payne had Nickels undress in his office and took sexually explicit photographs of Nickels on a blue couch in the office. While taking the photographs, Payne fondled Nickels' breasts, nipples, and genitals. After taking the photographs Payne had Nickels engage in sexual intercourse with Payne.

7. Payne transported Nickels to and paid $150 for one week at the Desert Inn, Room 68, 1003 South Midkiff, Midland, Texas in a 1985 white Toyota Forerunner, Texas Licence XV9-037. Payne gave Nickels $60 cash. Payne arranged for Nickels to work 12 P.M. to 3 P.M. at his office. During this time period Payne asked Nickels if her parents had Internet access. Payne told Nickels that he had posted the photographs he had taken of her on the Internet under a web page entitled . . . [sexually explicit].

8. On one occasion, while Nickels was working at the office, Payne had shown Nickels a number of computer disks. Payne inserted these disks into a computer and access them showing Nickels a series of sexually explicit photographs on the computer screen. Payne stated that the next time Nickels posed for more photographs she was to imitate the women depicted in these computer images.

9. On other occasions, while Nickels was working at the office, Payne suggested that Nickels could earn $75 by allowing other men to take sexual explicit photographs of her.

10. While working for Payne, Nickels learned that the computer in the office had Internet access and the Payne had a computer with Internet access at his home, 3000 South County Road, 1210, Space One, Midland Texas. [This paragraph included the following handwritten modification, which was initialed by the issuing magistrate: 3000 South County is the previous address of Payne. 6800 FM 307, Greenwood, Texas is Payne's current address.]

11. Some time around 26 or 27 May 2000 Payne met Nickels at a friend's apartment. Payne and Nickels drove in a read Chevrolet Camaro towards a strip club called "The Forrest" in

4

Ector County, Texas.  Payne wanted Nickels to strip on stage at "The Forrest."  Payne offered Nickels alcohol in an attempt to entice her to perform or accompany Payne to "The Forrest."  Nickels reminded Payne that Nickels was under aged.  Payne stated that he did not care, he knew the owners of "The Forrest" and could get Nickels a job there.

12. On May 28 2000 Payne gave Nickels $150 to pay for another hotel stay at the Days Inn, Room 3027, 4714 West Highway 80, Midland, Texas.  Nickels had a friend, Dejaun Andrews, register for the room because she was underage.

13. On 12 July 2000 law enforcement officers conducted a "trash cover" at the office of 705 West Indiana, Midland, Texas.  In the trash, determined to be from Payne's bond service, computer image printouts were found which depicted the front face picture of an Hispanic woman.  These images were approximately 1 ½ by 2 inches in size.  Another image, approximately 6 by 9 inches in size depicted an Hispanic woman in a "sexy" pose.  These images appear to have been made with a digital camera.  A computer printed page also was found which had been cut in such a way as to remove the computer image.

14. On 13 May 2000 Midland County Deputies served civil papers on Payne's office.  Deputies reported that the background of the computer printed images appeared to be Payne's office.  The deputies also reported that there was a blue couch in the back part of the office.

15. These Midland County Deputies [remainder of sentence is handwritten and initialed by the Magistrate] reported that Tamara and Bridget Wickerman stated that they could sleep with Payne to get out of jail.

16. Investigation into Payne's history showed that Payne was fired by Midland Police Department 16 years ago after being charged with rape.  Midland Police records indicate that Payne was stalking a former secretary and had record her to pose for sexually explicit photographs.  Payne reportedly dispersed copies of these photographs in the parking lot of her employer to defame her when she quit working for him.

17. Based on my training, knowledge and experience I have found that persons engaged in sexual exploitation of children often keep evidence relating to this exploitation in their homes, offices, and vehicles.  This evidence and the related records of child exploitation are produced and maintained by:

5

After drafting the affidavit, Agent Sutherland consulted with Detective Johnson, Inspector Beam, and a prosecutor with the U.S. Attorney's Office to be sure that the affidavit demonstrated probable cause. All agreed it did. The morning that Agent Sutherland was to present the affidavit to a magistrate, two deputies reported to him that they had received statements from two more women that the women could have sex with Payne to get out of

Digital cameras, Tapes, Cassettes, Cartridges, Streaming tape, Commercial software and hardware, computer disks, disk drives, Monitors, Computer Printers, Modems, Tape drives, Disk application programs, Data disks, System disk operating systems, Magnetic media, Floppy disks, Scanner, Video camera, Tape systems and hard drive, and other computer related operations equipment, Computer photographs, Graphic interchange formats, Video Tapes, Photographs, Slides or other visual depictions of child pornography, child erotica, Information pertaining to the sexual interest in child pornography, sexual activity with children or the distribution, possession, transmissions of receipt of child pornography, child erotica, or information to the sexual interest in child pornography.

The Internet and Internet Service Providers are used to disseminate child pornography. As previously mentioned, Payne informed one of the minor victims that he disseminated explicit photographs of her over the Internet.

Based upon the statements and investigation there in probable cause to believe that Lonnie Jearl Payne has knowingly employed, used persuaded, induced, enticed and coerced a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct and had reason to know that the image was that such visual depiction would be transported in interstate commerce, and such visual depiction was produced using materials that have been mailed, shipped, or transported in interstate commerce in violation of Title 18, United States Code, section 2251, Sexual Exploitation of Children and title 18, United States Code, Section 2252 and 2252(a), Certain Activities Relating to Material Involving the Sexual Exploitation of Minors and that evidence of such trafficking may be found in his possession.

6

jail. Agent Sutherland handwrote this additional allegation, as well as a correction of Payne's address, on the affidavit. He then presented it to the magistrate, who initialed the handwritten material to validate its inclusion in the affidavit, and, finding probable cause, issued warrants authorizing searches of Payne's home, office, and vehicle.

The search of Payne's home yielded a computer, computer disks, and other items, such as videotapes and undeveloped film. Officers also found several firearms, which they did not seize; instead, they obtained a second warrant for the firearms based on their observation of them during execution of the first warrant. The disks and computer revealed many images of pornography, some of which depicted teenaged children and young children. A disk in the home computer's A drive revealed sexually explicit images of Starla Nickels.

Payne was arrested and indicted in four counts, which charged him with violations of (1) 18 U.S.C. § 2251 (enticing a minor to engage in sexually explicit conduct); (2) 18 U.S.C. § 2252 (producing and transporting through interstate commerce a visual depiction of a minor engaged in sexually explicit conduct); (3) 18 U.S.C. 2252A (knowingly receiving child pornography and knowingly possessing child pornography); (4) and 18 U.S.C. §§ 922(g)(1) (felon in possession of a firearm).

Payne moved to suppress the evidence obtained from his home, arguing that the warrant was issued without probable cause. The

district court found both that probable cause supported the warrant and that, even if probable cause were absent, the evidence would be admissible under the good-faith exception to the exclusionary rule.

During the trial, Payne objected to duplicity in Count Three of the indictment. The district court determined that Payne had waived his objection by failing to raise it before trial. Fed. R Crim. Pro. 12(b). After reviewing the indictment to determine the potential prejudice to Payne, the court instructed the jury that Count Three charged two separate offenses and provided the jury a verdict form that allowed for a verdict on each offense. After the close of the government's evidence, the court acquitted Payne of Count Two based on insufficient evidence. The jury acquitted Payne of Count One and convicted him of both offenses charged in Count Three. Payne pled guilty to Count Four.

Payne now asserts that the rulings on his motion to suppress and his objection to the indictment were error. He also challenges sufficiency of the evidence supporting his conviction on Count Three.

II. MOTION TO SUPPRESS

Payne contends that the evidence from home must be suppressed, arguing that (1) the first warrant was issued without probable cause as to his home because the supporting affidavit provided no nexus between the alleged criminal activity and his home; and (2) probable cause for the second warrant was developed during the first, invalid search, therefore requiring suppression of any

8

evidence seized as fruit of the poisonous tree.

When the district court denies a motion to suppress, we review factual findings for clear error and conclusions of law de novo. United States v. Cherna, 184 F.3d 403, 406-07 (5th Cir. 1999). For purposes of the good-faith exception, we review the district court's evaluation of officers' objective reasonableness de novo. Id. at 1130 and n.10 (internal quotations omitted).

We consider probable cause questions in two stages. First we determine whether the good-faith exception to the exclusionary rule, announced in United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984), applies. See United States v. Pena-Rodriquez, 110 F.3d 1120, 1129-30 (5th Cir. 1997). If it does, we need not reach the question of probable cause for the warrant unless it presents a "novel question of law," resolution of which is "necessary to guide future action by law enforcement officers and magistrates," Id. (citations omitted). We conclude that this case presents no such novel question.

Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith. Leon, 468 U.S. at 921-25. "[T]he officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no

9

reasonable grounds for believing that the warrant was properly issued." Id. at 922-23 (citations omitted). The good faith exception cannot apply if one of four circumstances is present: "(1) If the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid." United States v. Webster, 960 F.2d 1301, 1307 n.4 (5th Cir. 1992).

In considering whether the good-faith exception applies, we do not attempt an "expedition into the minds of police officers" to determine their subjective belief regarding the validity of the warrant. Leon, 468 U.S. at 922 n.23 (internal quotations omitted). Rather, our inquiry is "confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. Whether the exception applies "will ordinarily depend on an examination of the affidavit by the reviewing court," United States v. Gant, 759 F.2d 484, 487-88 (5th Cir. 1985), but "all of the circumstances [surrounding issuance of the warrant] may

10

be considered." Leon, 468 U.S. at 922 n.23.

Payne argues that the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." While conceding that the affidavit supported probable cause that evidence of a practice of exchanging bail bonds for sex would be found at his office, Payne argues that it fails to demonstrate any likelihood that child pornography would be found in his home.

Facts in the affidavit must establish a nexus between the house to be searched and the evidence sought. United States v. Freeman, 685 F.2d 942, 949 (5th Cir. 1982). The nexus may be established through direct observation or through "normal inferences as to where the articles sought would be located." Id.

The affidavit contains two allegations concerning Payne's home: first, it asserts generally that "persons engaged in sexual exploitation of children often keep evidence relating to this exploitation in their homes, offices, and vehicles"; second, it states that Nickels learned while working for Payne that he had Internet access both at home and at the office.

Payne, emphasizing the fact that this was Agent Sutherland's first child sexual exploitation investigation, urges us to disregard the so-called boilerplate language of the affidavit asserting that evidence of child sexual exploitation is often kept in the home of the perpetrator. This generalization stated what Agent Sutherland learned in training and what more experienced

11

officers assisting him had learned in practice.[2] Agent Sutherland's training taught him that people who sexually exploit children tend to be "collectors" who keep evidence of the exploitation at home, in their vehicles, and at their workplaces. Generalizations in an affidavit regarding the likely location of evidence will not undermine the reasonableness of reliance on the warrant. See United States v. Broussard, 80 F.3d 1025, 1034 (5th Cir. 1996). While the generalization alone might be insufficient to render official reliance reasonable, other facts in the affidavit taken together with generalizations founded upon training and experience could support reasonable reliance. See id. at 1034-35.

Other facts in the affidavit lend support to the inference that evidence of child sexual exploitation might be discovered in Payne's home. The affidavit alleged that Payne had taken sexually explicit photographs of a minor, had sexual intercourse with the minor, told the minor that he posted the photographs of her on a sexually explicit site on the Internet, and sought to engage the minor in further sexually exploitative activity, even offering her alcohol to overcome her inhibitions. The allegation that Payne demanded sex from Nickels in exchange for bail bonds was corroborated by other women who, though not minors, had similar

---

[2] The affidavit states, and Agent Sutherland testified, that he relied on his own training as well as the expertise of more experienced officers in investigating Nickels's allegations and drafting the affidavit.

12

experiences with Payne. The allegation that Payne photographed Nickels was corroborated by photographs discovered in the trash outside Payne's office. The decision to credit seventeen-year-old Starla Nickels's story based on this corroboration, which we conclude would be a reasonable choice, warrants the further inference that Payne engaged in the sexual exploitation of a child.

The warrant alleged also that Payne had a computer with Internet access at home. The facility of transmission and receipt of digital photographs over the Internet, Payne's conduct toward Nickels and his statement that he posted nude photographs of her on the Internet, and the fact of Payne's Internet access at home all support the inference that a search of the home might produce evidence of child exploitation.

Agent Sutherland, Investigator Beam, and Detective Johnson–a quite experienced investigator–all agreed that probable cause existed, as did the U.S. Attorney with whom Agent Sutherland consulted, as did the magistrate. Given the facts in Agent Sutherland's affidavit, a reasonably well-trained officer would be entitled to accept the magistrate's determination that "the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe that the articles sought" could be located in Payne's home. United States v. Maestas, 546 F.2d 1177, 1180 (5th Cir. 1977)(internal quotations omitted). As we have stated, "few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime."

13

<u>United States v. Green</u>, 634 F.2d 222, 226 (5th Cir. Unit B Jan. 1981). Although this notion does "not provide carte blanche for searching a home when one is suspected of illegal activity," <u>United States v. Pace</u>, 955 F.2d 270, 277 (5th Cir. 1992), the inference before us requires no such unfettered discretion.

Payne urges that the allegation that he had Internet access at home is conclusory and should be disregarded. If the veracity of an informant's statement can otherwise be determined, the basis for the informant's knowledge need not necessarily accompany every fact reported by the informant, <u>See</u> <u>United States v. Kolodziej</u>, 712 F.2d 975, 977 (5th Cir. 1983)(citing <u>Illinois v. Gates</u>, 462 U.S. 213, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983)), especially if the informant is a victim or witness rather than a professional confidential informant, <u>see, e.g.</u>, <u>United States v. Blount</u>, 123 F.3d 831, 836 (5th Cir. 1997)(en banc)(whether subsequent corroboration is necessary depends on totality of the circumstances); <u>United States v. Fooladi</u>, 703 F.2d 180, 183 (5th Cir. 1983)(police should be able to depend on reliability of average citizen absent special circumstances); <u>United States v. Bell</u>, 457 F.2d 1231, 1238 (5th Cir.1972)(reliability of informant who is identified victim-witness to a crime need not be established in the officer's affidavit).

Nickels, the victim of alleged exploitation by Payne, was a non-professional informant. We recognize, however, that her arrest for credit card abuse arguably casts doubt on her credibility. As

14

we discussed above, the affidavit described police investigation that led to corroboration of Nickels's account, including the statements of other women who had similar knowledge of or experience with Payne, and digital photographs discovered in the trash outside Payne's office. Nickels was a non-professional informant who gave a detailed statement and whose allegations were corroborated in part by police investigation. Official reliance on her statements in the affidavit is not unreasonable.

In sum, we reject Payne's contention that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923. We conclude, considering the affidavit and the circumstances surrounding issuance of the warrant, that the good faith exception applies. Because the first search of Payne's home was valid, the second warrant prompted by weapons observed during the first search was likewise valid.

III. DUPLICITY OF THE INDICTMENT

Payne argues that he was prejudiced by duplicity in Count Three of his indictment.[3] The government points out that Payne

---

[3] An indictment is duplicitous when two separate offenses are charged in a single count. § 2252A names receiving and possessing child pornography, which were both charged in Count Three of Payne's indictment, as separate offenses:

a) Any person who--

                    * * *

  (2) knowingly receives or distributes--

15

waived this objection because he failed to raise it before trial.[4]

Because Payne objected to the indictment only after the trial began, the Rule 12(e) waiver applies.[5]  Our only question, then, is whether the district court properly exercised its discretion in

> (A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or
>
> (B) any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;
>
> * * *
>
> (5) either--
>
> (B) knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;
>
> * * *

shall be punished as provided in subsection (b).

18 U.S.C. § 2252A.

[4] Rule 12(b)(3) provides:  Motions That Must Be Made Before Trial. The following must be raised before trial:
* * *
(B) a motion alleging a defect in the indictment or information--but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense....


[5] At oral argument counsel for Payne cited United States v. Winters, 105 F.3d 200 (5th Cir. 1997), as holding that plain error review applies despite a defendant's waiver.  Winters does not stand for that proposition.

refusing to grant Payne relief from waiver.  See <u>United States v.</u>

<u>Elam</u>,  678 F.2d 1234, 1251 (5th Cir. 1982).

The district court was well within its discretion.  The judge instructed the jury that Count Three comprised two offenses and listed the elements of each offense.  The verdict form distinguished clearly between the two offenses charged in Count Three and required the jurors to return a verdict for each offense.[6]  Finally, after the jurors returned verdicts of guilty on both offenses in Count Three, the court dismissed one offense and sentenced only based on the remaining offense.  Payne, having waived his objection to the indictment, cannot now argue that the district court should have granted the particular remedy of forcing the government to elect one offense or the other.

Payne also objects to the absence of a definition for the word "receiving" in the jury instructions.  Payne failed to object to the instruction at trial; therefore, we review for plain error, which "occurs only when [the] instruction, considered as a whole,

---

[6] The verdict form read in part:

Count Three

Do you find by proof beyond a reasonable doubt that:

1. Defendant is ____guilty/ not guilty____ Of each and every
element of Count Three as to knowingly receiving child
pornography?

2. Defendant is ____guilty/ not guilty____ Of each and every
element of Count Three as to knowingly possessing child
pornography?

17

was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice." United States v. Davis, 19 F.3d 166, 169 (5th Cir. 1994). Payne asserts that, left without a definition of "receiving," the jury could do nothing but convict him based on the definition given them of the word "possessing." This argument defies common sense. It stands to reason that the jury, given no definition of "receiving," would apply the word in its everyday sense, thus differentiating between receiving and possessing. Payne has failed to demonstrate that the instruction was so erroneous as to result in a miscarriage of justice.

IV. SUFFICIENCY OF THE EVIDENCE

Payne challenges the sufficiency of the evidence supporting his conviction for knowingly receiving child pornography. Sufficiency of the evidence in a criminal case turns on whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. United States v. Smith, 296 F.3d 344, 346 (5th Cir. 2002)(citations omitted). We view all evidence and all reasonable inferences drawn from it in the light most favorable to the verdict. Id.

Payne's sufficiency of the evidence challenge focuses on whether the evidence supports a finding that he knowingly-i.e., voluntarily and intentionally-received child pornography. Payne admitted to downloading the profusion of pornographic images discovered on disks and the computer in his home, including the images of child pornography. He testified, however, that he did

18

not know that he was receiving child pornography because most of the photographs were downloaded using America Online 3.0, and he could not view the photographs until after he had downloaded them to computer disks.

The record illustrates that the content of many of the child pornography images was evident from their file names.[7]  When asked whether, given the volume of photographs in his possession, he did not realize at some point what he was receiving, Payne responded: "I knew that I was receiving child pornography and other pornography but most of them disks were downloaded back when I had the 3.0 and I couldn't see the picture until after it was downloaded."

We conclude that the number of images in Payne's possession,[8] taken together with the suggestive titles of the photographs and Payne's testimony that he knew he was receiving child pornography, supports the jury's inference that Payne knew he was receiving child pornography.

VI. CONCLUSION

---

[7] For example, Detective Sheldon Johnson testified that some of the child pornography images bore names such as "help mom," "nude Deb," "four teen," "12 F K," "11 pose," "mom teach," and "10 on dad." R.6 197-200.

[8]  Payne argues that the jury could not have used the fact of his possession to infer that he knowingly received child pornography.  We disagree.  The jury was entitled to infer that Payne's past experiences downloading pictures of child pornography at some point enabled him to predict the content of child pornography images bearing suggestive labels.

The officers who searched Payne's home did so in objectively reasonable good faith reliance on the search warrant.  Thus, the district court was correct to deny Payne's motion to suppress.  The weapons seized in the second search deriving from the first were likewise admissible.  Payne waived his objection to duplicity in his indictment, and the district court properly exercised its discretion in refusing to grant Payne relief from the waiver.  Finally, we conclude that the record is sufficient to support Payne's conviction for knowingly receiving child pornography.  We affirm the judgment of the district court.

AFFIRMED.