**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 10, 2009

Charles R. Fulbruge III
Clerk

No. 07-60247

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KENNETH STALNAKER; KIMBERLY A. CASTLE,

Defendants-Appellants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

No. 07-60079

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

RICHARD B. LUCAS; KIMBERLY A. CASTLE; KENNETH STALNAKER,

Defendants-Appellees.

Appeals from the United States District Court
for the Southern District of Mississippi
No. 2:06-CR-1-4

Before DAVIS, SMITH, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Kenneth Stalnaker and Kimberly Castle were found guilty of various crimes, including bank fraud and wire fraud. After the verdict, the district court dismissed the bank fraud-related counts. The government appeals that dismissal; Stalnaker and Castle appeal their convictions and Castle her sentence. We affirm the convictions and sentence and, as a result, do not reach the merits of the government's appeal.

I.

A.

Richard Lucas orchestrated an elaborate mortgage fraud operation that purchased cheap property and, through various acts of fraud, resold it at a higher price. He first bought inexpensive pieces of property, often in his half-brother's name. Then, several licensed appraisers, including Stalnaker, produced inflated appraisals of the properties.

Other members of the conspiracy recruited buyers, most of whom were falsely promised that the properties were investments and that Stalnaker would find tenants, collect rent, and use that money to pay the mortgages. The buyers were further enticed by "no money down" promises or, in some cases, paid for their participation. If they did not have the means to buy the properties hon-

estly, still more members of the conspiracy would forge documents (such as W-2's and paystubs) that would be used to obtain mortgage loans.

Castle is the attorney who handled the closings on the original property purchase and the inflated resale. At closing, the mortgage company wired Castle the money with instructions not to release it until the down payment had been received. Castle ignored the instructions and released the money immediately; Lucas then improperly used the money to make the down payment, which enabled him to entice buyers with a no-money-down promise. He also used some of the profits from the sale to pay buyers for their participation.

## B.

Lucas and a dozen others were charged in a twelve-count indictment with bank fraud, wire fraud, conspiracy to commit money laundering, and conspiracy to commit bank fraud, wire fraud, and submission of false statements.[1] Ten of the defendants pleaded guilty, leaving Lucas, Stalnaker, and Castle to face trial. With three mostly irrelevant exceptions, the jury found them guilty.[2] The district court then dismissed, for lack of jurisdiction, the bank fraud count and the bank fraud object of the conspiracy count.

---

[1] The indictment can be summarized as follows:

| Count 1: | Conspiracy to commit bank fraud, wire fraud, and submission of false statements |
| Count 2: | Bank fraud |
| Counts 3-11: | Wire fraud (each count alleges a separate date on which the defendants used wires for their scheme) |
| Count 12: | Conspiracy to commit money laundering |

[2] Those exceptions are that (1) Stalnaker was not charged with money laundering; and (2) and (3) the jury found him not guilty on two of the nine wire fraud counts—specifically, counts 4 and 7.

## II.

## A.

Stalnaker claims there is insufficient evidence to support a conviction.[3] After briefly stating the elements of the crime and the standard of review, he says,

> The issue for appellate review is whether reasonable minds could have found evidence inconsistent with every reasonable hypothesis of innocence. *United States v. Escobar*, 674 F.2d 469 (5th Cir. 1987). There is no hypothesis that evidence supports that Kenneth Stalnaker knew or was a knowing participant in any bank fraud scheme. Defendant Stalnaker's conviction for wire fraud should be set aside and vacated.

Stalnaker does not discuss the facts of the case, cite the record or anything other than general sufficiency-of-the-evidence caselaw, or explain his "hypothesis of innocence." Where a defendant asserts "that the evidence was insufficient to convict him" but fails "to make *any argument whatsoever* to support this contention," the issue is considered abandoned. *United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992).

There is easily enough evidence that Stalnaker was an active participant in the conspiracy. Indeed, his brief includes trial excerpts of a witness's testimony that Stalnaker manipulated appraisals to match Lucas's requested valuations.

## B.

The government presented witness Janet Chatman, who, on direct examination, experienced what appeared to be a panic attack, which twice interrupted

---

[3] Stalnaker raises the issue three times in separate sections of his brief. In the first, he argues that the court erred in not granting his motion for judgment of acquittal. In sections titled "The evidence at trial was legally insufficient to support a conviction of Kenneth Stalnaker" and "The verdict at trial was contrary to the evidence and strongly against the weight of the evidence," he merely cross-references his earlier argument with a "see above."

her questioning. After taking a break, she was unable to return. The court struck her testimony and instructed the jury to disregard it. Stalnaker unsuccessfully moved for a mistrial on grounds that his Sixth Amendment right to cross-examine was violated; the court denied that request.

"Alleged violations of the Confrontation Clause [of the Sixth Amendment] are reviewed *de novo*, but are subject to harmless error analysis." *United States v. Bell*, 367 F.3d 452, 465 (5th Cir. 2004). "Ordinarily, a witness is considered to be a witness 'against' a defendant for purposes of the Confrontation Clause only if his testimony is part of the body of evidence that a jury may consider in assessing his guilt." *Cruz v. New York*, 481 U.S. 186, 190 (1987). This follows from the "almost invariable assumption of the law that jurors follow their instructions . . . ." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). [4]

Because of the court's instruction, Chatman's stricken testimony was not part of the "body of evidence" that the jury could consider in assessing guilt and thus could not be the basis for a confrontation violation. Accordingly, the court did not err in denying a mistrial. [5]

---

[4] There are only narrow exceptions to this rule : "[A] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson*, 481 U.S. at 207 (summarizing *Bruton v. United States*, 391 U.S. 123 (1968)). The Court created that exception because "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135. This is not one of those situations.

[5] "A new trial is required only when, after a review of the entire record, it appears that there is a significant possibility that the prejudicial evidence had a substantial impact on the jury verdict." *United States v. Valles*, 484 F.3d 745, 756 (5th Cir. 2007). Chatman was one of nine mortgage borrowers who described her dealings with Lucas, and the district court characterized her testimony as "cumulative" and "essentially no different from numerous other witnesses that testified." It is therefore unlikely that her testimony had an impact on the verdict, and any error in admitting it was harmless.

## C.

Stalnaker filed several unsuccessful motions to sever. He contends that he was prejudiced by having to go to trial with a "bad person co-defendant" and was "convicted by the overwhelming spillover proof of guilt of Richard Lucas."

"We review a grant or denial of severance for abuse of discretion." *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007). "A severance is reversible only on a showing of specific compelling prejudice. There is a preference in the federal system for joint trials of defendants who are indicted together,' particularly in conspiracy cases." *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)) (internal citation omitted).

In *Lewis*, *id.* at 384, we held that a "district court did not abuse its discretion in denying [defendants'] motions for severance" in which they "complain[ed] broadly of the volume of evidence, the disparity of evidence between defendants, and a generalized spillover effect," but "[n]one point[ed] to any specific prejudice resulting from their combined trial." Stalnaker raises identical arguments; the district court did not abuse its discretion. [6]

Moreover, the jury found Stalnaker not guilty on two counts on which it found his co-defendants guilty. That suggests that the jury did not blindly convict Stalnaker on spillover evidence but instead gave each defendant and each count separate consideration.

---

[6] The government correctly points out that all of the cases Stalnaker cites regarding the need for severance from a "bad person co-defendant" actually address severing multiple charges against an individual defendant. *See United States v. McCarter*, 316 F.3d 536, 538 (5th Cir. 2002); *United States v. Singh*, 261 F.3d 530, 534 (5th Cir. 2001); *United States v. Daniels*, 770 F.2d 1111 (D.C. Cir. 1985); *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994). Those courts held that where one charge introduces evidence of a prior felony (e.g., a charge for felon in possession of a firearm), it should be severed from other, unrelated charges, because of the "danger that the jury might convict, not based on the evidence, but because it feels the defendant is a 'bad person.'" *Singh*, 261 F.3d at 534. Those decisions thus have nothing to do with "bad person co-defendants."

D.

Stalnaker alleges that the above errors cumulatively deprived him of a fair trial. But where "we find no merit to any of [the defendant's] arguments of error, his claim of cumulative error must also fail." *United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992).

III.

A.

Castle appeals the denial of her motion to suppress. The facts are that one of the buyers recruited into Lucas's scheme, Tyronica James, decided to go to the police. She gave Detective Rusty Keyes copies of her closing papers, which were prepared by Castle and contained an inflated appraisal and fraudulent financial information (e.g., reporting that she earned $1800 per month when she only earned $800). Following up on this lead, Keyes contacted a former Countrywide office manager, who reported that she had quit doing business with the Lucas group and Castle when she noticed that two loans had the same bank statements attached. Keyes next spoke with a Countrywide regional manager who stated that there were many delinquent loans that she believed were connected to loans from the same group involved in the James incident.

Based on the information from James and the two Countrywide managers, Keyes received a warrant to search Castle's law office for documents related to closings performed for Lucas. Before trial, Castle unsuccessfully moved to suppress the fruits of that search.

"When the district court denies a motion to suppress, we review factual findings for clear error and conclusions of law *de novo*." *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003). Probable cause questions are evaluated in two steps: "First we determine whether the good-faith exception to the exclusionary rule . . . applies. If it does, we need not reach the question of probable cause for

the warrant unless it presents a novel question of law, resolution of which is necessary to guide future action by law enforcement officers and magistrates." *Id.* (internal citations and quotation marks omitted).

> Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith. . . . The good faith exception cannot apply if one of four circumstances is present: (1) If the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid.

*Id.* at 399-400 (internal quotation marks and citations omitted).

Castle contends that the court erred in not allowing her to impeach James's credibility during the hearing on the suppression motion. James's credibility is irrelevant, however. As the court noted, "what is relevant for the suppression hearing is what she told the officer" and "any reason that he had to challenge her credibility . . . ." The court therefore correctly considered only whether the officer was objectively reasonable in relying on James's statements; it does not matter whether, unbeknownst to the officer, her story was completely fabricated.

Castle also argues that the warrant lacked sufficient indicia of probable cause and reliability. But James's statements were corroborated not only by the closing documents she provided––which were prepared by Castle and contained false information––but also by two Countrywide managers, one of whom specifically reported suspicious mortgage applications from Castle. Keyes was therefore not entirely unreasonable in believing that the warrant provided probable

cause, and the good faith exception applies.

## B.

### 1.

Castle appeals the sufficiency of evidence for her wire fraud convictions. We review the conviction *de novo* and ask "whether a reasonable jury could conclude that the relevant evidence, direct or circumstantial, established all of the essential elements of the crime beyond a reasonable doubt when viewed in the light most favorable to the verdict." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001).

"To prove wire fraud under 18 U.S.C. § 1343, the government must prove: (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *United States v. Ingles*, 445 F.3d 830, 838 (5th Cir. 2006) (citation and internal quotation marks omitted). Wire fraud is a specific-intent crime requiring proof that the "defendant knew the scheme involved false representations," *United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1324 (2008), which related to material information, *see Neder v. United States*, 527 U.S. 1, 25 (1999).

Further, "[o]nce membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *United States v. Dula*, 989 F.2d 772, 778 (5th Cir. 1993). And because Castle was charged as an aider and abettor of wire fraud, the government need only establish that she "assisted the actual perpetrator of the wire fraud crimes while sharing the requisite criminal intent." *United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002). Castle argues that (1) the government did not present sufficient evidence that a wire was used; (2) there was no proof of specific intent; and (3) the false documents Castle signed were immaterial or not in furtherance of

the scheme, because they were not used for approving or denying the loan.

2.

In regard to the first point, Castle's primary complaint is that the government did not produce records of specific wire transmissions. But, as the government points out, the "wire-transmission requirement may be established by circumstantial evidence, such as customary business practices." *United States v. Moody*, 903 F.2d 321, 332 (5th Cir. 1990). The government presented testimony from multiple Countrywide employees about its customary business practice of using a wire system called EDGE to process mortgage loan transactions, a system that Countrywide began using at least three years before defendants' conduct.

Next, there was substantial circumstantial evidence from which a jury could conclude that Castle possessed the requisite intent. First, at the closing, she violated instructions from the lending company that she "not close the loan or disburse the funds" until receiving the down payment from the borrower. Instead, she disbursed the funds immediately, then Lucas used them to make the down payment. Second, she handled the closings on the initial house purchases and the subsequent sales, so she knew that the latter prices were substantially inflated––the government points to two examples in which the home values doubled in a day. Both are circumstantial evidence of Castle's intent to defraud Countrywide.

Finally, in response to Castle's argument that her participation was either immaterial or not in furtherance of the scheme, the government explains:

> That the final [documents] were signed after the receipt of the funds makes no difference. Castle's office faxed draft [documents] to Countrywide before [each] of the closings for approval. . . . By falsely certifying she had received the down payments, Castle helped Lucas complete the fraud. By continuing to handle Lucas's loan clos-

10

ings despite being aware of the inflated values of the properties and the true source of the down payments, Castle played an integral part in perpetrating the fraud.

In short, viewed in the light most favorable to the verdict, there was more than sufficient circumstantial evidence to support the verdict.

## C.

Castle avers that the verdict rests on insufficient legal theories. The government charged Castle with conspiracy to commit money laundering, alleging that the proceeds from the conspiracy to commit bank fraud, wire fraud, and false statements in a loan application (all alleged in count 1) were used to conduct financial transactions with intent to promote further unlawful activity.[7] After the guilty verdict, the court entered a judgment of acquittal for the bank fraud-related charges, because it believed it lacked jurisdiction over them. The court also dismissed the false-statements-in-a-loan-application charge as to Castle by determining that there was no evidence that she participated in preparing loan applications (her role was handling closing documents).

With two of the three objects of the money laundering scheme dismissed, Castle argues that the court erred in not granting her motion to dismiss the money-laundering charge. She reasons that because the verdict did not specify "which alleged basis the jury found these alleged proceeds came from[] (i.e.[,] the dismissed or not dismissed parts thereof)," it is possible that the jury convicted on an invalid legal theory.

Castle is correct that her conviction should be dismissed if the verdict

---

[7] The money-laundering statute imposes criminal penalties on anyone who, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity . . . ." 18 U.S.C. § 1956(a)(1)(A)(i).

11

might have been based on an insufficient legal theory.

> In *Yates v. United States*, 354 U.S. 298, 312 . . . (1957), the Supreme Court held that where a jury returns a general verdict of guilt that might rest on multiple legal theories, at least one insufficient in law and the others sufficient, the verdict must be set aside. In such a situation, we cannot trust the jury to have chosen the legally sufficient theory and to have ignored the insufficient one, because "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law." *Griffin v. United States*, 502 U.S. 46, 59 . . . (1991).

*United States v. Skilling*, 554 F.3d 529, 542-43 (5th Cir. 2009) (alteration in original), *petition for cert. filed* (May 11, 2009) (No. 08-1394).

There is, however, no risk that Castle's conviction might rest on an insufficient legal theory. All the proceeds used in the alleged money laundering were derived from the mortgage transactions, and each of those transactions included both the dismissed charges (bank fraud and false statements) and the not-dismissed charge (wire fraud). In other words, all the proceeds were derived from wire fraud––there was none from bank fraud or false statements alone.

Further, the jury found that Castle participated in the wire fraud. The special verdict on the conspiracy count found her guilty of all three objects of the conspiracy (bank fraud, wire fraud, and false statements), and she was found guilty on all nine individual counts of wire fraud. Because the verdict makes plain that the jury believed Castle committed wire fraud, it is not possible that the money-laundering conviction rests on proceeds only from the dismissed bank fraud or false statements theories.

Stated another way, the verdict indicates that (1) the conspiracy used proceeds from the mortgage transactions to promote further mortgage transactions, and (2) all of those mortgage transactions contained wire fraud. There is thus no doubt that the jury found Castle was a member of a conspiracy that used the proceeds from wire fraud to promote further wire fraud and, therefore, commit-

ted money laundering.[8]

### D.

Castle contests the denial of a continuance. Before trial, she substituted new counsel. Three days later, her new counsel moved for a continuance, which was denied two days after that. The court, however, extended the motions deadline several weeks, and trial did not begin until more than six weeks later.

"Trial judges have broad discretion in deciding requests for continuances, and we review only for an abuse of that discretion resulting in serious prejudice." *United States v. German*, 486 F.3d 849, 854 (5th Cir. 2007).

> In reviewing the denial of a continuance, this court looks to the totality of the circumstances, including
> (a) the amount of time available;
> (b) the defendant's role in shortening the time needed;
> (c) the likelihood of prejudice from denial;
> (d) the availability of discovery from the prosecution;
> (e) the complexity of the case;
> (f) the adequacy of the defense actually provided at trial;
> and (g) the experience of the attorney with the accused.

*United States v. Walters*, 351 F.3d 159, 170 (5th Cir. 2003) (internal quotation marks and citations omitted). "If the challenged decision is neither arbitrary nor unreasonable, we must uphold the trial court's decision to deny the continuance, even when we consider the decision to be a harsh one." *United States v. Hughey*, 147 F.3d 423, 431 (5th Cir. 1998).

Although she points to no specific prejudice, Castle generally argues that "this was a complex, massive document intense case that required numerous hours of preparation, review and research." Under even more dire circumstanc-

---

[8] Under the money-laundering statute, wire fraud is a defined "specified unlawful" activity. 18 U.S.C. § 1956(c)(7) (incorporating all unlawful acts listed in 18 U.S.C. § 1961(1), which includes wire fraud).

es, however, where counsel was given only ten days to prepare in a case that involved "ten defendants, even more witnesses, and voluminous discovery," we found that denial of a request for continuance was not an abuse of discretion, because "there [was] no evidence that [the defendant] was seriously prejudiced by the denial of his request for a continuance." *United States v. Lewis*, 476 F.3d 369, 387 (5th Cir. 2007). We also noted the effectiveness of trial counsel. *Id.* ("[Defendant]'s attorney effectively challenged the witnesses . . ., made intelligent arguments in his opening and closing statements . . ., and benefitted from the arguments of other defense counsel . . . .").

As in *Lewis*, there is no evidence that Castle was seriously prejudiced, and her counsel did an adequate job at trial. This is indeed a complicated case, but the court showed reasonableness and flexibility by adjusting the motions deadline; counsel had several weeks to prepare; Castle benefited from having two co-defendants each represented by his own counsel; the government cooperated by providing organized discovery binders; and Castle's counsel is a seasoned attorney. There is no indication of substantial prejudice.

## E.

Castle alleges that cumulative error at trial violated her right to due process. Although she describes a laundry list of grievances, she does not fully explain them and often does not cite the record or relevant law.[9] As a result, most of the matters are waived for inadequate briefing.[10]

---

[9] For example, without citing either the record or law, Castle states merely that "[t]he court below used a 'blind strike' method of jury selection, thereby depriving your appellant of being able to exercise all of her limited peremptory strikes." Two other one-sentence arguments contain citations, but the cited cases have no relevance to the appeal.

[10] *See* FED. R. APP. P. 28(a)(9)(A); *L & A Contracting Co. v. S. Concrete Servs.*, 17 F.3d 106, 113 (5th Cir. 1994) (waiver for failing to cite authority); *United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992) (failure to argue adequately).

14

Castle gives some attention to her allegation that in closing argument the prosecution made "an indirect comment on appellants [sic] Fifth Amendment rights",[11] improperly attempted to infer guilty knowledge or intent, argued matters not in evidence, and made incorrect statements about the presumption of innocence. None of those justifies reversal.

First, the government explains that the prosecutor was not commenting on defendant's choice to remain silent when the he stated that "[defendant] wants you to turn this blind eye and say she's not involved"; instead, he was responding to Castle's argument that she could not be held responsible, because it was her secretary who signed the closing papers. Second, Castle did not object to the alleged inferences of knowledge or intent; we therefore review only for plain error,[12] and she has not borne that burden. Third, the court did sustain an objection as to the prosecutor's statement on matters not in evidence. Fourth, the government's comments about the presumption of innocence were merely statements that it had met its burden of proof, a type of closing argument that we have approved.[13]

---

[11] Castle does not cite to the record but quotes the prosecutor as having said that "now she wants to turn a blind eye and say she's not involved, she doesn't know . . . and further, . . . so if something comes up, she can say, well, I didn't sign this . . . she knew something was wrong." That quotation is stitched together from disparate comments made across eight pages of closing argument transcript.

[12] To prove plain error, Castle must "show (1) there was error, (2) the error was plain, (3) the error affected [her] 'substantial rights,' and (4) the error seriously affected 'the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Jones*, 489 F.3d 679, 681 (5th Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 732, 734 (1993)).

[13] *See, e.g.*, *Bridge v. Lynaugh*, 838 F.2d 770, 774 n.1 (5th Cir. 1988) ("[T]he prosecutor's argument was that the evidence presented by the state was sufficient to overcome defendant's presumption of innocence, but that in order to convict defendant, the government would have to prove all the necessary elements beyond a reasonable doubt. The prosecutor merely argued that the government had carried that burden.").

F.

Castle raises four alleged sentencing errors. "[W]e review the district court's interpretation and application of the [Sentencing] Guidelines de novo. We will accept findings of fact made in connection with sentencing unless clearly erroneous." *United States v. Armendariz*, 451 F.3d 352, 357 (5th Cir. 2006) (internal citation omitted).

1.

Castle alleges that the district court improperly sentenced her under U.S.S.G. § 2S1.1 (money laundering) instead of § 2B1.1 (fraud and deceit). The court, however, correctly followed § 3D1.2, which instructs that "counts involving substantially the same harm shall be grouped together into a single Group."

> The district court was required to "group" together [defendant's] fraud and money laundering offenses because those crimes involved the same victim and involved multiple acts that were linked by a common illegal objective or part of a common scheme. Once grouped, the district court properly determined that money laundering produced the higher offense level and properly imposed sentence under that guideline, § 2S1.1.

*United States v. Powers*, 168 F.3d 741, 753 (5th Cir. 1999) (citation omitted).

2.

Castle contends that the court improperly calculated Countrywide's losses to determine whether an offense-level increase applied. Specifically, the court examined Countrywide's business records—admitted as evidence during trial and summarized in the presentence report ("PSR")—that showed a $1,450,388 loss; the court applied a sixteen-level increase for losses in excess of $1 million. [14]

---

[14] That increase is pursuant to § 2S1.1(a)(2), which instructs the court to increase the offense level based on a table found in § 2B1.1.

"A [PSR] generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making the factual determinations required by the sentencing guidelines. A district court may adopt facts contained in the PSR without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence." *United States v. Alford*, 142 F.3d 825, 831-32 (5th Cir. 1998) (internal citations and quotation marks omitted).

Castle says that the court erred in relying on the PSR and should have required "Court records showing actual 'sales' for each and every property . . . ." But Countrywide's business record documentation was an adequate evidentiary basis, and Castle has not carried her burden "of showing that the information in the PSR relied on by the district court is materially untrue." *Id.* at 832 (citation and internal quotation marks omitted). Castle also claims that the court incorrectly "'ignored' what money [Countrywide] received from the foreclosure and/or sales" of the fraudulently purchased homes, but those figures were explicitly calculated in the PSR.

3.

Castle avers that the court erred in applying an enhancement for use of a "special skill." She argues that no special skill was used, and, in any case, she did not "significantly facilitate[] the commission or concealment of the offense" as required by the sentencing guidelines. *See* U.S.S.G. § 3B1.3.

The guideline commentary, however, specifically mentions lawyers as an example of those possessing a special skill.[15] In the authority Castle relies on, *United States v. Hemmingson*, 157 F.3d 347, 359-60 (5th Cir. 1998), the special-

---

[15] U.S.S.G. § 3B1.3 cmt. n.4 ("'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include . . . lawyers . . . .").

skill enhancement did not apply, because the defendant, although a lawyer, had not performed any legal services. By comparison, Castle acted as a lawyer and rendered legal services in performing the mortgage closing. The district court's conclusion that it was "obvious to me and to everyone else that's been around the real estate practice that there is a special skill" was therefore not erroneous.

4.

Castle claims a disparity between her sentence and those of her co-conspirators. But "a disparity of sentences among co-defendants does not, without more, constitute an abuse of discretion. The defendants cannot rely upon their co-defendants' sentences as a yardstick for their own." *United States v. Devine*, 934 F.2d 1325, 1338 (5th Cir. 1991) (internal citations omitted).

IV.

At oral argument, the government indicated that it would abandon its appeal of the dismissal of the bank fraud-related charges if Castle's and Stalnaker's other convictions were upheld.[16] Having found no error in regard to those convictions or sentences, we therefore do not reach the bank fraud issue.

AFFIRMED.

---

[16] Specifically, at oral argument the government's attorney stated, "If the court were to otherwise find the defendants appropriately guilty and convicted of the other counts, we would not be asking the court to reach the bank fraud issue." He explained that addressing the issue would be unnecessary, because it would not affect the defendants' sentences beyond a potential $100 special assessment.