# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-30084

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

ROBERT RICKS, also known as Ra-B Ricks,

      Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:16-CR-11-1

Before CLEMENT, GRAVES, and OLDHAM, Circuit Judges.

PER CURIAM:*

A jury found Robert Ricks guilty of several drug and gun crimes. He asks this court to overturn that verdict and quash his indictment because of alleged procedural errors. Finding no reversible error, we AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-30084

## FACTS AND PROCEEDINGS

In February 2015, the New Orleans Police Department (NOPD) received a tip that someone named "Robbie" was dealing drugs out of a house at 1201 Belleville Street. Robert Ricks lived there with his girlfriend Mandi Malbroue (Mandi) in a house owned by Mandi's parents.

NOPD officers conducted surveillance of the house. Officer Chantell Long observed from a car. She saw Ricks engage in multiple hand-to-hand drug transactions and relayed that to nearby teams, who stopped the individuals immediately thereafter, discovering them to be in possession of heroin.

As they approached the house to execute a warrant four days later, officers observed Ricks completing another drug deal. In Ricks's and Mandi's bedroom, officers discovered heroin, crack cocaine, powder cocaine, marijuana, a digital scale bearing drug residue, drug paraphernalia, $3,641 in cash, and a loaded handgun.

Ricks and Mandi were arrested on state gun and drug charges. Mandi pleaded guilty to the drug charges but not to the gun charge. Ricks was charged, federally, with conspiracy to possess heroin and cocaine with the intent to distribute, possession of heroin and cocaine with the intent to distribute, possession of a firearm in connection with a drug-trafficking offense, and being a felon in possession of a firearm.

Prior to trial, Ricks moved to quash the indictment, alleging that federal agents had met with Mandi on two occasions and that, on both occasions, she admitted to owning the gun and the drugs. According to Ricks, the agents responded by threatening Mandi with federal charges if she testified in his defense. Ricks asserted that these threats would interfere with his ability to call a witness and violate his rights under the Fifth and Sixth Amendments,

2

"[i]f the government does not cure its interference . . . by granting Mandi immunity."

The Government denied that Mandi had been threatened, arguing that agents had only cautioned her that, if she knowingly provided false testimony, she would risk prosecution for perjury. The Government then offered her statutory immunity, allowing her to testify without fear of prosecution on the drug and gun charges.

The district court entered an order giving Mandi immunity. The order stated that no information derived from her testimony could be used against her in any criminal case "except in a prosecution for perjury, [or] giving a false statement." The court denied Ricks's motion to quash as moot—presumably because of the immunity deal.

Four days before trial, Ricks learned that Officer Long had been diagnosed with a brain tumor that affected her vision. Ricks moved for a continuance to investigate, urging that the evidence was potentially exculpatory, but the Government opposed the motion, asserting that the officer's medical condition did not constitute exculpatory information and was irrelevant as the condition did not appear until months after the surveillance at issue. The Government noted that Officer Long's testimony would be corroborated by significant evidence, including the testimony of other officers working surveillance with her and individuals who met with Ricks shortly before their arrests. The district court denied the continuance.

At trial, Officer Long testified about the surveillance, as well as about her medical condition. She denied having had any issues in February 2015 and identified Ricks as the individual she observed dealing drugs. Defense counsel questioned her about her condition and the onset of her symptoms.

Individuals Officer Long observed engaging in hand-to-hand transactions testified at trial, admitting that they had been arrested for drug

3

possession on February 15, 2015, and that they had met with Ricks immediately prior to their arrests. Other officers working with Officer Long corroborated her testimony. Additionally, one of them testified that he had also participated in executing the search warrant and that the drugs were hidden among men's clothing and behind a shoe rack containing men's shoes. The powder cocaine was located near an identification card bearing Ricks's name, and the card was covered in powder, indicating that it had been used to cut the drugs. The officer also stated that the gun was found hidden in a man's sock in a drawer alongside some containers for men's watches. Ricks identified himself as the owner of the cash found on the scene.

An individual named James Chapman testified that he had been regularly using crack cocaine, which he bought from Ricks. Chapman saw Ricks selling drugs to others, introduced him to other dealers, and sometimes drove him to drug deals. A neighbor testified that he had seen Ricks dealing drugs on numerous occasions; he explained that Ricks and Mandi worked together.

Cellphones seized during the search showed that, in the five days between the surveillance and search, Ricks had made or received more than 500 phone calls, most of which lasted less than one minute and many of which occurred after midnight. Several contacts listed in Ricks's phone contained the notation "sm" or "smk," apparently meaning "smack," slang for heroin. Ricks's phone also had listed as a contact "Apple," who was known to be a narcotics trafficker, as well as other contacts also known to be traffickers. Text messages

No. 18-30084

from Ricks's phone revealed exchanges setting up drug deals and texts from Mandi referencing those deals and warning Ricks about police activity.

Bureau of Alcohol, Tobacco, and Firearms Agent Anthony Calagna testified[1] that, in January 2015, he began conducting video surveillance on the 1200 block of Belleville Street related to another investigation, and that the video surveillance had captured Ricks conducting what appeared to be hand-to-hand drug transactions. He became involved in Ricks's case after Ricks and Mandi were arrested, and he interviewed Mandi. Mandi told agents that the drugs and gun were hers, and she pleaded guilty to drug charges in state court, but the agents believed that Ricks and Mandi jointly owned the drugs and that Mandi was not being truthful. Additionally, at least in part because Mandi did not plead guilty to the gun charge, the agents suspected that the gun was not hers. Mandi was not charged federally.

Agent Calagna explained that, when he questioned Mandi, Mandi repeated that both the drugs and gun were hers. He specifically testified as follows:

> Q: Did you ask [Mandi] about the drugs and gun found during the search outside of the grand jury?
> A: I did.
> Q: What did she say?
> A: She said that the guns and the drugs were hers.
> Q: Did she say – did she deny that they were [Ricks's]?
> A: No, she did not – well, initially, she did.
> Q: Okay. What did you tell her?
> A: We explained to her that we knew what she was doing. We knew that she was taking – attempting to take the charges for [Ricks]. We explained to her that if she was put into the grand jury and sworn under oath, that she'd be committing perjury in a federal grand jury.

---

[1] The district court had ordered that each side sequester its witnesses, so Mandi was presumably not present to hear this testimony.

5

No. 18-30084

Q: Why did you believe that giving that testimony to the grand jury would be perjury?

A: Because based on the evidence we knew, the fact that she didn't plead to the gun in Orleans Parish, and that we believed that Robert Ricks was also in control of those narcotics and the firearm.

Q: What happened after you told her that lying in the grand jury would be – could be a crime?

A: She broke down. She was crying. She told us that she just couldn't do it. She couldn't testify against [Ricks], that he's the father of her child, but that she would cooperate on any other individuals in the 1200 block of Belleville and testify against them.

Q: Did you threaten that you would seek to charge her in the federal drug case if she didn't change her story and say that the drugs were [Ricks]'s?

A: No, sir.

Q: Did you try to coerce her into saying that the drugs were [Ricks's]?

A: No, sir.

Q: Did you coerce her into saying that the gun was [Ricks's]?

A: No, sir.

Q: Was she called to testify before the grand jury?

A: She was not.

Q: Why not?

A: Because we knew that putting her in the grand jury knowing that she was lying was going to make her available to potential perjury charges, which we weren't going to do to her.

Ricks renewed his motion to quash, urging that this testimony amounted to a threat to prosecute Mandi for perjury, rendering the immunity grant null. The district court denied the motion.

Agent Calagna went on to say that he had listened to phone calls recorded at the Orleans Parish prison, including one between two individuals known as "Butter" and "Apple," in which Butter directed Apple to collect money from Ricks.

Defense counsel asked Agent Calagna whether he had also reviewed any of Ricks's prison phone calls, and Agent Calagna responded that he had. Counsel then stated that the Government had not provided copies of Ricks's

6

No. 18-30084

prison phone calls, argued that the calls likely showed that Ricks had denied any involvement in drug trafficking, and claimed that the records constituted exculpatory *Brady* material.

The Government responded that it had no discovery obligation relating to Ricks's prison calls both because Ricks's phone calls were irrelevant and because they were not in the Government's custody or control. The call records were maintained in the parish prison facility, not the federal Bureau of Prisons, and although agents could log onto the parish prison system to review the calls, the Government claimed it did not have custody over the records. The Government further noted that Ricks was a participant in his own calls. The district court overruled the objection, concluding that there was no discovery violation.

Despite the order granting Mandi immunity, Ricks did not call her as a witness, instead asking Agent Calagna whether the drugs belonged to her and her previous boyfriend, "Pig." During closing argument, defense counsel raised the issue of Officer Long's impaired vision and asserted that the Government's failure to produce Ricks's calls indicated that they contained no incriminating evidence.

The jury found Ricks guilty on all counts.

### STANDARD OF REVIEW

The existence of substantial interference with the right to call a witness and to present a defense is a "factual question" that is reviewed for clear error. *United States v. Thompson*, 130 F.3d 676, 686–87 (5th Cir. 1997); *see also United States v. Skilling*, 554 F.3d 529, 567 (5th Cir. 2009), *aff'd in part and vacated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). "A factual finding is clearly erroneous only if, based on the entirety of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made." *United States v. Cordova-Soto*, 804 F.3d 714, 718

No. 18-30084

(5th Cir. 2015). Any such violation is subject to harmless-error analysis, and this court "will not reverse unless the . . . conduct was sufficiently egregious in nature and degree so as to deprive [the defendant] of a fair trial." *Skilling*, 554 F.3d at 567 (second alteration in original) (internal quotation marks omitted).

A district court's denial of a continuance is reviewed for an abuse of discretion. *United States v. Porter*, 907 F.3d 374, 383 (5th Cir. 2018); *United States v. Stalnaker*, 571 F.3d 428, 439 (5th Cir. 2009); *United States v. Walters*, 351 F.3d 159, 170 (5th Cir. 2003). "[T]he movant must show that the denial resulted in specific and compelling or serious prejudice." *United States v. Barnett,* 197 F.3d 138, 144 (5th Cir. 1999) (internal quotation marks omitted). This court will uphold the district court's decision, even if it was harsh, if it was not arbitrary or unreasonable. *Stalnaker*, 571 F.3d at 439.

This court reviews "alleged discovery errors for abuse of discretion and will order a new trial only where a defendant demonstrates prejudice to his substantial rights." *United States v. Garcia*, 567 F.3d 721, 734 (5th Cir. 2009); *see also United States v. Doucette*, 979 F.2d 1042, 1044–45 (5th Cir. 1992).

## DISCUSSION

Ricks argues that, when it threatened Mandi, the Government interfered with his constitutional rights to call witnesses and to present a defense. He says that Mandi's testimony would have been material and exculpatory and that he could not establish his innocence without it. He relies on Agent Calagna's testimony establishing that Mandi was willing to testify that the drugs and gun were hers and urges that Agent Calagna's threat, communicated in open court, to prosecute her for perjury if she testified for the defense, amounted to misconduct. Although Ricks admits the grant of immunity cured the initial alleged "threats" in conversations with

8

investigating officers, he argues that Agent Calagna's threat during his trial undid the cure.[2]

A criminal defendant has a right under the Sixth Amendment to "present witnesses to establish his defense without fear of retaliation against the witness by the government." *United States v. Dupre*, 117 F.3d 810, 823 (5th Cir. 1997). Moreover, "the Fifth Amendment protects the defendant from improper governmental interference with his defense." *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir. 2002). So "[s]ubstantial government interference with a defense witness' free and unhampered choice to testify violates [the] due process rights of the defendant." *United States v. Anderson*, 755 F.3d 782, 792 (5th Cir. 2014) (internal quotation marks omitted).

To prevail on a claim of substantial interference, "the defendant must show a causal connection between the governmental action and the witness' decision not to testify." *Id.* (internal quotation marks omitted). Showing a mere correlation between the Government's action and the witness's decision not to testify will not suffice. *United States v. Girod*, 646 F.3d 304, 312 (5th Cir. 2011).

Ricks acknowledges that the Government offered Mandi immunity. But, in his brief, he contends that Agent Calagna's testimony to the effect that Mandi risked perjury if she testified that the gun and drugs were hers constituted an open-court threat that intimidated her.

---

[2] At oral argument, counsel suggested that the alleged open court threat was not actually reversible error but rather that the agent's previous communications with Mandi amounted to threats and that the immunity waiver did not cure those threats. Counsel offered no evidence that Ricks made this argument to the district court and did not brief it in this court. Indeed, the argument in Ricks's brief—rather than the new one presented at oral argument—is consistent with the objection counsel lodged at trial. Accordingly, this new argument has been forfeited. *See Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 89 (5th Cir. 2011) (preserving an argument on appeal requires that the argument "be raised to such a degree that the district court has an opportunity to rule on it" (internal quotation marks omitted)); *United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000) (*per curiam*) (reciting the longstanding "rule in this circuit that any issues not briefed on appeal are waived").

No. 18-30084

Ricks has provided no evidence showing that Agent Calagna's testimony was the reason that Mandi did not testify.[3] *See Anderson*, 755 F.3d at 792; *see also Thompson,* 130 F.3d at 687 ("The defendant bears the burden of showing that testimony would have been different *but for* the government's actions.").

When Agent Calagna testified, Mandi had not been called. And at the start of trial, the district court had ordered the witnesses sequestered. So Mandi was presumably not present to hear the alleged threat on which Ricks bases his interference claim. Ricks does not offer any theory as to how Mandi heard Agent Calagna's testimony or how it affected her. Indeed, at oral argument, counsel admitted that Mandi could not have heard Calagna's testimony.

It was not clearly erroneous for the district court to conclude that an alleged threat, which was admittedly not heard by the person allegedly being threatened, did not amount to substantial interference.

But there is an independent problem. Our caselaw holds that a constitutional violation, under *Webb v. Texas*, 409 U.S. 95 (1972), requires (1) a threat of certain prosecution (2) directed specifically at the witness. *See, e.g.*, *United States v. Jackson*, 453 F.3d 302, 306 n.8 (5th Cir. 2006); *United States v. Gloria*, 494 F.2d 477, 484–85 (5th Cir. 1974); *United States v. Miller*, 491 F.2d 638, 648 n.17 (5th Cir. 1974). Even assuming Mandi was made privy to Calagna's testimony—indeed, even assuming she was in the room—neither of those prerequisites would be met here. An investigator talked about (not to) a potential witness and about possible (not certain) prosecution.

---

[3] The causation evidence on which Ricks relies—an affidavit executed by a private investigator for the defense—was submitted as part of the pretrial motion to quash before Mandi was granted immunity and is irrelevant to the argument briefed on appeal. In other words, Ricks needed to introduce some evidence showing that Agent Calagna's testimony and interview statements had scared Mandi out of testifying *despite* the subsequent grant of immunity.

No. 18-30084

Ricks next contends that the district court erred in denying his pretrial motion for a continuance following the Government's late disclosure that Officer Long had been diagnosed with a condition affecting her vision. He complains that the Government disclosed that there were numerous other young black men being investigated for street-level drug dealing in the same area and that the denial of the continuance forced him to proceed to trial without time to investigate whether Officer Long's medical condition impacted her ability to identify Ricks. Ricks argues that the denial limited his ability to cross-examine Officer Long.

Ricks's general complaints about an inability to investigate Officer Long's condition do not demonstrate that he suffered specific or compelling prejudice. Because his briefs do not point to any specific or compelling prejudice, he has forfeited any such argument. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010); Fed. R. App. P. 28(a)(8)(A). Ricks also does not rebut the Government's argument that Ricks's charges were unrelated to Officer Long's identification because he was not charged with the distributions observed during the surveillance.

Even had he briefed the argument and responded to the Government, the evidence corroborating Officer Long's testimony is utterly overwhelming. Individuals to whom Officer Long observed Ricks sell drugs were stopped shortly thereafter with drugs and admitted to meeting with Ricks immediately prior to their being stopped. Others described witnessing Ricks engaged in the sale of illegal drugs. And Ricks's bedroom was filled with drugs, cash, a gun, and drug paraphernalia. Consequently, Ricks cannot show that the denial of his motion for a continuance was an abuse of discretion because it could not have amounted to anything more than harmless error—which cannot logically have caused prejudice.

No. 18-30084

Finally, Ricks urges that the Government violated Federal Rule of Criminal Procedure 16 by failing to provide him tapes of his prison phone calls, and that the district court erred in concluding that the tapes were not discoverable. He claims that he was prejudiced as a result and that reversal is warranted because, without access to those calls, his ability to cross-examine Agent Calagna was improperly limited.

Ricks cannot demonstrate that the district court abused its discretion under Rule 16 because he fails even to assert that the records were "relevant" to any issue at trial.[4] Indeed, at oral argument, counsel conceded that Ricks never mentioned the calls to counsel—suggesting that there was nothing relevant on them since he, as a participant, must have been aware of their contents.

Moreover, even if the failure to disclose the records amounted to error, Ricks cannot show that the error was sufficiently prejudicial to warrant reversal because, as the district court found, Ricks was already aware of the substance of his own prison phone calls and could have easily subpoenaed the records himself. *See United States v. Ellender,* 947 F.2d 748, 756–57 (5th Cir. 1991) (rejecting the claim that the prosecutor violated the district court's discovery order and *Brady* by failing to produce the defendant's prison records because, with reasonable diligence, he could have obtained the material himself); *see also Doucette,* 979 F.2d at 1045 (applying the same "reasonable diligence" standard to claims under Rule 16).

Additionally, any claim of resulting prejudice fails given the "overwhelming" trial evidence demonstrating Ricks's guilt. *See United States v. Cochran,* 697 F.2d 600, 606–07 (5th Cir. 1983) (finding no reversible error

---

[4] For that reason, we need not resolve the contested question of whether the records were in the Government's possession, custody, or control.

No. 18-30084

resulting from the Government's failure to produce during discovery copies of tape-recorded conversations between the defendant and others given the independent "overwhelming" evidence of the defendant's guilt); *see also Garcia,* 567 F.3d at 735 (determining that the sufficiency of the evidence to support the defendant's conviction defeated his ability to demonstrate the requisite prejudice resulting from an alleged Rule 16 violation).

The district court's discovery ruling does not amount to reversible error.

## CONCLUSION

For the foregoing reasons, we AFFIRM.[5]

---

[5] Most of the dissent is devoted to second-guessing the jury by asking factual questions. Were the athletic socks in the dresser men's socks or women's socks? Did Ricks or his girlfriend wear men's watches? In a text exchange between Ricks and his girlfriend, does "them people" refer to police officers? Was Tory Cargo, Ricks's next-door neighbor, a credible witness? It is the jury's job—not ours—to grapple with these factual questions. The dissent has less to say about the legal questions. And even there, the dissent does (or redoes) defense counsel's job. The dissent admits Mandi could not have heard Agent Calagna's "threat" in the courtroom. So, it points to Calagna's earlier conversations with Mandi and argues, "Ricks does not admit that the grant of immunity cured any [earlier] threats." Ricks's own counsel recognized this immunity-is-no-cure claim was raised for the first time at our oral argument. Oral Argument at 24:04-24:30 ("I think that in the briefing I was looking at this a little differently than I should have."). More fundamentally, the dissent never grapples with the fact that Ricks conditioned his motion to quash on "the government . . . cur[ing] its interference . . . by granting Mandi immunity." The government did so. Once we admit that, the only explanation left is the dissent thinks that, to effectively cure any constitutional violation, a grant of immunity must immunize a witness from prosecution for perjury. Not so. *See United States v. Apfelbaum,* 445 U.S. 115, 126 (1980).

No. 18-30084

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

Because I would conclude that the government substantially interfered with Robert Ricks' ability to call witnesses and present a defense, which constitutes clear error, and that the trial court abused its discretion in denying a continuance and in not requiring the government to permit access to Ricks' telephone calls reviewed by authorities, I would vacate and remand. Therefore, I respectfully dissent.

Robert Ricks appeals his conviction for conspiracy to possess with the intent to distribute cocaine and heroin, possession with the intent to distribute cocaine and heroin, possession of a firearm in connection with a drug-trafficking offense and being a felon in possession of a firearm. He was sentenced to 300 months imprisonment.

The majority gives a summary of the facts. However, a detailed discussion of the facts is necessary to understand just how crucial any errors were to Ricks' conviction. The majority attempts to dismiss any detailed discussion of the facts presented at trial as second-guessing the jury. Perhaps that explains how the majority repeatedly reached the unsupported and erroneous conclusion that the evidence against Ricks was "utterly overwhelming." The government's failure to introduce absolutely any evidence connecting Ricks to any gun or to the actual drugs found in the Malbroue residence establishes that the government's interference with Ricks' ability to call a defense witness, the denial of Ricks' request for a reasonable amount of time to investigate the debilitating vision problems of the only eyewitness to any alleged hand-to-hand transaction during relevant time period, and the denial of Ricks' access to jail calls reviewed by the government were anything but harmless.

In February 2015, the New Orleans Police Department (NOPD) received an anonymous tip that someone named "Robbie" was dealing drugs out of a

residence located in the 1200 block of Belleville Street in the Algiers neighborhood. This area was known as a "hot block" with a lot of foot and vehicle traffic and numerous individuals involved in criminal activity, including dealing drugs. Mandi Malbroue's (Malbroue) parents, Carolyn and Troy Malbroue, owned a house at 1201 Belleville Street. During the time period in question, Robert Ricks, also known as "Ra-B," was living with Malbroue, their minor child, and her parents at that residence. Also living around the same block was a probationer with prior drug convictions named Robie Turner, who was under investigation during the same time period and who had also absconded at the time of Ricks' trial, according to his probation officer.

During the evening of February 15, 2015, Officer Chantell Long conducted surveillance from a car parked a block or so away. Among the numerous people and cars, Long observed a person she identified as Ricks engage in what she suspected were two or possibly three hand-to-hand drug transactions. One of the suspected transactions involved a female who walked up around 6 p.m. and briefly sat in a red, Dodge Challenger parked on the street with a male who Long believed was Ricks. A second suspected transaction involved a male passenger exiting a pickup truck and briefly meeting with a male Long identified as Ricks on the front porch at 1201 Belleville. A third suspected transaction involved the male Long identified as Ricks briefly entering a maroon Jeep on the street. Long radioed nearby officers who stopped the individuals from the first and second transactions. Those nearby officers did not witness any of the suspected transactions. Additionally, the Jeep was not stopped and there was no confirmation that any of its occupants were actually involved in any drug transaction.

Nearby officers conducted a pedestrian stop of the female, Nicole Feloss Hill, approximately three or four blocks away. During a search, officers

recovered one yellow, rectangular pill later identified as Xanax that Hill said she bought from someone else on the street - not from Ricks. Officers also stopped the pickup truck. Passenger Kendall Syvle was in possession of heroin and a syringe. Syvle, who will be discussed in more detail later, did not know the name of the person who sold him the heroin.

Just a few days later, on February 19, 2015, officers served a search warrant in the pre-dawn hours on the Malbroue residence. Officers said that, as they approached the house to execute a warrant at 5:45 a.m., they saw a black male complete what they believed was a hand-to-hand transaction. However, Ricks was inside the house in his pajamas and not wearing shoes when officers arrived. A drug dog failed to alert to any drugs in the house. In Ricks' and Malbroue's shared bedroom, officers discovered heroin, crack cocaine, powder cocaine, marijuana, a digital scale, drug paraphernalia, cash and a loaded gun.[1]

The gun was found inside a sock in a plastic set of drawers in the shared bedroom. The exhibit photo shows a black, low cut, athletic sock of the variety that typically comes in both men's and women's styles. Authorities also found an empty, black, plastic box for a firearm. Authorities said there were "a couple of containers for men's watches in the drawer." Yet, the government offered no evidence to connect Ricks to any watch containers, the sock or the gun.[2]

Men's clothing was not kept in the plastic set of drawers containing the gun or in the wooden dresser, where officers located the cocaine base. Officers

---

[1] Interestingly, authorities did not recover any Xanax, the type of drug Hill had one pill of in her possession that she maintained she bought from someone on the street and not from Ricks.

[2] The majority erroneously assumes that the presence of watch boxes in a drawer means that either Malbroue or Ricks was wearing men's watches. Yet the government offered no evidence of the existence of any actual watches and failed to connect any watches or any boxes to either Ricks or Malbroue.

testified that the dresser drawers contained "junk" like "chargers and, like, broken electronics type stuff." Additionally, officers described the contents of the dresser as "ambiguous," indicating it was impossible to tell whether the items belonged to a male or female. Further, Ricks' clothes were on a bookshelf, along with pieces of his mail and his ID. Those items are how authorities tied Ricks to powder cocaine found on the bookshelf.

In any event, Ricks and Malbroue were arrested on state gun and drug charges.[3] Malbroue's parents received citations for being in possession of marijuana. At the time, Malbroue also had pending state court gun and drug charges stemming from her arrest on June 1, 2014, while living on Iberville Street with a previous boyfriend, Isiah Theophile, also known as "Pig." The majority states that Ricks identified himself as the owner of the cash found on the scene. But the majority fails to mention that Malbroue also identified herself as the owner of that same cash, which was later used to pay her state court fines.

**\* *Witness Interference***

Beginning in 2013, federal authorities were involved in an investigation, known as "Hot Block," of a group of individuals involved in violent crimes in the area of the 1200 block of Belleville Street in the Algiers neighborhood of New Orleans. Ricks was not part of this investigation, which involved the placement of a pole camera in the 1100 block of Belleville in December of 2014 because of activity involving firearms. Not only did the investigation and camera have nothing to do with Ricks, but all potentially relevant video was destroyed.

---

[3] Malbroue ultimately pleaded guilty to the state drug charges. Meanwhile, Ricks received federal charges.

No. 18-30084

Despite the fact that any alleged video was destroyed and not available for review, the district court allowed Special Agent Anthony Calagna with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to testify about it, over objection. Specifically, Calagna was allowed to say what he read about Ricks in a police report in which he was in no way involved and to say that he believed he had previously seen Ricks on video engaged in hand-to-hand drug transactions. Calagna admitted that he made no effort to identify the person he claims he saw on video and failed to save or download the video in any way. Further, Calagna admitted that he could not say he definitely recognized Ricks on the video, but said, again, that he believed it was him because other details matched up with a police report he read at some point. Once authorities decided to pursue federal charges against Ricks, Calagna became involved in his case.

Without the presence of her counsel, Calagna also called Malbroue in for at least two interviews after she and Ricks were arrested but before Ricks' federal indictment. Calagna said officials did not believe it necessary to go through Malbroue's counsel because "we weren't going to address any of her participation or current court proceedings in regards to that case." During the first interview at the ATF office, Malbroue was asked about Ricks and, according to Calagna, said: "She told us that the drugs found during the NOPD search warrant were not Robert's and neither was the gun." However, Calagna chose not to believe her. Likely because accepting her statement as true would address her participation and would mean Calagna improperly interrogated her without the presence of counsel. Following the first meeting, Malbroue accepted a state plea deal, pleading guilty to only possession of narcotics.

The second interview occurred outside the grand jury room at the federal courthouse while Malbroue was in state custody. Again, Calagna asked Malbroue about the drugs and gun found during the search. Again, Malbroue

18

said the gun and drugs were hers and denied they belonged to Ricks. Again, Calagna chose not to believe her. At that point, Calagna conveyed the following threat to Malbroue: "We explained to her that we knew what she was doing. We knew that she was taking – attempting to take the charges for Robert. We explained to her that if she was put into the grand jury and sworn under oath, that she'd be committing perjury in a federal grand jury." Calagna claimed he believed it would be perjury because Malbroue accepted a plea deal that did not include the gun charge and because he believed Ricks was also in control of those narcotics and the firearm. After conveying the threat of perjury if Malbroue did not implicate Ricks, Calagna said: "She broke down. She was crying. She told us that she just couldn't do it. She couldn't testify against Robert, that he's the father of her child, but that she would cooperate on any other individuals in the 1200 block of Belleville and would testify against them." Importantly, Malbroue never told Calagna that the drugs or gun belonged to Ricks. Instead, Malbroue consistently maintained the drugs and gun belonged to her. Specifically, Malbroue said she told the agents she "knew they had found the gun in her drawer in a sock."[4] Further, Malbroue "said that she told them that she had the gun because, during the period she was selling drugs out of her house on Iberville, there was an incident where someone locked a car door, so she couldn't get out, put a gun to her head, and stole her purse. She said she acquired the gun so she would be able to protect herself if something like that ever happened again." To prevent Malbroue from telling the grand jury the gun and drugs belonged to her, authorities then decided not to call her to testify. Instead, Calagna was allowed to tell his version of the conversation with Malbroue to the grand jury and his belief that she was lying and would perjure herself.

---

[4] Malbroue was interviewed by a private investigator who provided an affidavit.

No. 18-30084

Prior to trial, Ricks unsuccessfully attempted to quash the indictment on the basis that federal agents had met with Malbroue on those two occasions and that on both occasions she admitted owning the gun and drugs. Malbroue repeatedly told the agents that the gun and drugs were hers, that the gun was in her drawer, and that she had bought the gun to protect herself after being robbed. Malbroue also repeatedly denied to agents that the drugs and gun belonged to Ricks.

In response to Ricks' motion to quash, the U.S. Attorney moved for an order compelling Malbroue's testimony and granting her immunity. It was granted on the first day of trial. However, the order entered granted immunity, "except in a prosecution for perjury, giving a false statement, or failing to comply with this Order." As stated above, when Calagna met with Malbroue without the presence of her counsel, he told her that she would be facing charges if she testified the gun and drugs were hers, as she had consistently maintained, because she had accepted a plea deal in state court that did not include the gun charge. Calagna repeated this same threat at trial. Malbroue said Calagna also told her that authorities would press charges against her and she was "going to go down for this too" if she testified on Ricks' behalf.

Ricks again moved to quash, asserting that Calagna's testimony basically rendered Malbroue's immunity ineffective.[5] The district court denied Ricks' motion. Malbroue was present at the courthouse and prepared to testify on Ricks' behalf at trial. However, after Calagna's testimony, Malbroue left the courthouse and did not testify.

At Rick's trial, Hill testified that she had become friends with Ricks when he worked at a barber shop on Washington Avenue and she went to see him to try to borrow some money to buy a Mardi Gras outfit. Hill denied that she

---

[5] The majority ignores the fact that Ricks re-asserted his motion to quash.

purchased or received any drugs from Ricks. She also said there were more than 10 people hanging out on Belleville when she went to see Ricks because it is a hot block.

Syvle testified that he bought different drugs from different individuals on the corner of Belleville, but he didn't know the names of any of the dealers on the corner. He said one person was called "R."[6] Syvle also testified that he had been high and awake for two or three days at the time of the transaction and had "dealt with maybe 100 guys" that weekend. Syvle also repeatedly testified that officers told him they had him on video buying drugs from an individual they said was Ricks or "Ra-B." Interestingly, during the portion of redirect when Ra-B was referenced, the prosecutor is who first mentioned the name "Ra-B" and the record does not reflect that the name was spelled for the record at that time, yet the transcript shows the unique spelling of "Ra-B" and not "Robbie" or "Robie." More importantly, though, no such video ever existed. The only video was from the later stop of the vehicle and arrest of Syvle.

After reference to the video, Ricks' counsel said: "We would ask for any such film. None has been produced to us in discovery, Judge, and we don't believe there is any such film." The court then called counsel to the bench and chastised Ricks' lawyer for even asking for the video that Syvle testified about repeatedly, saying: "I don't know whether there is or isn't, but you shouldn't do that in front of the jury. You can raise that with me separately." Ricks' counsel replied: "But, Judge, I think it is highly misleading for the witness --" At that point, the court inquired into the existence of any film and the government admitted it had no such film. The court then told the government to call their next witness.

---

[6] The government failed to introduce any evidence indicating Ricks was ever known as "R."

Another witness, James Chapman, who suffered a head injury in 1996 that affects his memory, also testified.  Chapman said that he had previously bought marijuana and crack on "the hot block" from numerous individuals including a female named "Dew," a male named "T.O.," who was arrested in Chapman's car, Ra-B, and others.  Chapman said he met Ra-B through Ra-B's drug-dealer neighbor, Danita, and that Chapman hung out on Danita's front porch and purchased his drugs at Danita's.  Chapman also testified that Ra-B never sold drugs from the Malbroue residence at 1201 Belleville Street and he never saw Ra-B with a gun and never heard him reference a "gun."  Chapman said he heard Ra-B say "the thing" before and thought maybe that meant a gun.  Chapman also said that he acted as an intermediary for a few sales to other drug dealers for Ra-B.  Chapman said that he had an ongoing, paid-informant relationship with "Tony," Special Agent Anthony Calagna with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), that started before he ever met Ricks and continued after he met Ricks.[7]  However, Chapman said authorities never asked him to make a controlled buy from Ricks.  Further, authorities never even asked Chapman anything about Ricks until after Ricks was arrested.  But Chapman had stopped associating with Ricks and hanging around that area by that time.  During cross-examination, Chapman was unable to explain why he spelled his name "C-h-a-p-i-m-a-n" before the grand jury or why there was no record of any phone contact between himself and Ricks during the time period he says he was dealing with Ricks.

Calagna testified extensively regarding information found on cellular telephones belonging to Ricks and Malbroue.  Much of his testimony involved him interpreting what he believed various messages meant.  For example, Calagna testified that Malbroue sent Ricks a text messages stating: "Be careful

---

[7] Chapman said the ATF paid him more than $4,000.

because them people riding around." Calagna said, based on his training and experience, "them people" refers to the police. However, the very next text Calagna testified about was a message Mandi sent Ricks saying, "The police just came up the one way." It makes no sense why Malbroue would use "them people" as code for the police in one text but refer to the police as "the police" in another text. Also, it would seem "them people" Malbroue was warning Ricks to be careful of could also be the numerous violent offenders federal officials were investigating on the block. Additionally, Calagna testified to numerous texts on Malbroue's phone indicating that she was selling narcotics independent of Ricks. There were also numerous messages between Malbroue and her ex-boyfriend, Isiah Theophile, also known as "Pig." Malbroue and Theophile previously had been arrested together for drug and gun violations.

Notably, Calagna did not write any investigative reports or witness reports on Ricks' case. Instead, Calagna relied solely on the previous reports done by NOPD and whatever testimony was provided to the grand jury. Although, as we know, Malbroue was ultimately not called to testify in front of the grand jury. Instead, Calagna just remembered what she said. Calagna apparently did make some outlines of notes on some witnesses, but those were not turned over to the defense. Calagna also testified that he never considered Robbie to be anyone other than Ra-B, despite the fact that neither Ricks nor 1201 Belleview were part of his prior investigations. However, 1209 Belleville, which was Danita's house two doors down, was referred to by Calagna in his grand jury presentation as "Crack Dealing Headquarters and Cook House." During his testimony, Calagna also identified various hot block drug dealers of similar size and description to Ra-B that were included in his grand jury presentation. Another individual, Sidney Frazier, was identified by Calagna as one of the leaders of the gang Swu Woo. Calagna said, "Swu Woo it's derived from the Blood Gang. Hot Block is derived from Swu Woo." When asked

whether he was aware that Robie Turner was also a member of Swu Woo, Calagna said he was not aware.

The majority mentions a neighbor who testified that he saw Ricks dealing drugs on numerous occasions and that Ricks and Malbroue worked together. That neighbor was Tory Cargo. The ATF paid Cargo $600 for his testimony before the grand jury. Calagna testified that Cargo was having financial difficulties supporting his seven children. Cargo testified at Ricks' trial that, while on parole for a prior conviction, he was motivated to contact the ATF and offer testimony against Ricks "because of the things that I've been through on Belleville, and the way that my kids can't, you know, really go outside, you know, due to the things that go on around Belleville." Yet one of Cargo's numerous prior convictions involved him pleading guilty to having his daughter in the backseat while engaged in a drug deal in Jefferson Parish. Cargo was also arrested for possession with intent to distribute crack approximately one month after his grand jury testimony. Cargo was in custody and in a work release program for that offense when he testified at Ricks' trial. Because Cargo missed work, he also planned to receive additional payment for his testimony at trial.

Cargo testified that he got out of jail in January of 2015 and was staying at 1236 Belleville. Cargo said he would leave early in the morning to go job hunting and would not return to Belleville until "about 10 in the evening – 10 that morning." But whenever he returned from his long hours of job hunting, Cargo would visit his girlfriend, Jamie, who lived at 1213 Belleville. Cargo said Jamie lived two doors down from the Malbroue house with her sister, Cassie Picquet, who was both a drug user and a drug dealer. Cargo testified that Picquet sold crack and used heroin, which she bought from Ricks. Cargo said that when Ricks was not home, Picquet bought drugs from Mandi. Cargo

said that he knew about this because he overheard Picquet's phone conversations.

Cargo told Calagna during interviews that he had never seen Ricks with a gun. Cargo also testified before the grand jury that he had never seen Ricks with a gun. At trial, Cargo changed his story and said that he saw a bulge in Ricks' shirt. Specifically, Cargo said: "Well, I seen a bulge in his shirt. You know how – you know how somebody, you know, has something up under their shirt and you know it's a gun? You know the difference between a phone, a knife, and a gun."

Cargo's girlfriend lived next door to 1209 Belleville, which was Danita's house. Cargo referred to Danita's house as a "trap house," a "place where all the drug dealers hang at" to "sell their crack and stuff like that." Cargo said that at different times when he was hanging out at Danita's "trap house," he saw Ra-B there too. When asked what Ra-B was doing at the trap house, Cargo said, "[w]ell, basically, you know, probably hanging out sometime or, you know, talking to the fellas who were on the – the other fellas who were over there, you know." Cargo also testified to what he believed was Ra-B asking Danita to cook some crack, "[s]o he was like, 'Teedie [Danita's nickname], I need you for to, you know, cook this up for me." Cargo did not explain how he knew "this" meant crack. Cargo also said he heard Ra-B talk about money, "[h]e was like, 'All, you know, all blue faces, you know, you all get your money up." Cargo said, "blue faces" meant 100-dollar bills and Ra-B was "really talking to the hustlers that's on the block" who were "having conversations and stuff like that." Cargo also testified that he saw a photo of Ra-B with cash in his hand. Cargo also said that all of the guys on the block were users and dealers except for him. Despite Cargo's various drug arrests, having previously been sentenced to drug court, constant association with drug dealers and users, and his penchant for trap houses, he claimed he never touched the stuff.

No. 18-30084

As the majority states, Ricks has a Sixth Amendment right to "present witnesses to establish his defense without fear of retaliation against the witness by the government." *United States v. Dupre*, 117 F.3d 810, 823 (5th Cir. 1997). "Substantial governmental interference with a defense witness' choice to testify may violate the due process rights of the defendant." *Id.* (Internal marks omitted). "[S]o long as the investigation of witnesses is not prompted by the possibility of the witnesses testifying, and so long as the government does not harass or threaten them, the defendant's rights are not violated." *United States v. Whittington*, 783 F2d 1210, 1219 (5th Cir. 1986); *see also United States v. Fricke*, 684 F.2d 1126, 1130 (5th Cir. 1982). Additionally, "the Fifth Amendment protects the defendant from improper governmental interference with his defense." *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir. 2002).

Ricks asserts that the government interfered with his constitutional rights to call witnesses and present a defense when it threatened Malbroue because her testimony would have been material and exculpatory. The majority seemingly disregards this argument on the basis that there is no indication Malbroue was present in the courtroom during Calagna's testimony.[8] Regardless of whether Malbroue heard Calagna's testimony, there is no dispute that his testimony corroborated Malbroue's statements about their meetings without the presence of her counsel and her fear that, if she testified to what she consistently maintained was truthful, authorities would pursue additional charges against her. Further, as Malbroue was represented by counsel, one would presume that her counsel had some inkling of what was going on at that point and that Malbroue had received a copy of the "immunity"

---

[8]The majority erroneously interprets this as some concession that there is no way Malbroue could possibly have known about Calagna's reassertion of the threat at trial. It is no such thing.

26

order setting out exceptions for the very charges authorities had consistently threatened.

The majority asserts that Ricks "admits the grant of immunity cured the initial alleged 'threats' in conversations with officers" but then says he argued "that Agent Calagna's threat during trial undid the cure." However, Ricks does not admit that the grant of immunity cured any threats. Ricks states that the government offered the immunity motion as a remedy for the error. He does not say the offered remedy cured any error. In fact, the grant of immunity containing exceptions for the very threats asserted by Calagna was not a cure. Moreover, I disagree with the majority's attempt to couch this as a new issue not previously raised. Ricks has consistently asserted the entire time that Calagna made the same threat three different times – twice while interviewing Malbroue without the presence of counsel and once at trial. Ricks has also asserted the entire time that these threats were not cured by anything and constituted interference with his ability to call a witness and present a defense. Ricks objected and moved to quash two different times. There is nothing inconsistent between the arguments at trial, the arguments in his brief and his oral arguments on this matter, which the district court has already had an opportunity to rule on. *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 89 (5th Cir. 2011).

The majority also states that Ricks has provided no evidence showing that Agent Calagna's testimony was the reason that Mandi did not testify." Thus, the majority concludes that Ricks is unable to show a causal connection between the governmental action and Malbroue's decision not to testify. *See United States v. Anderson*, 755 F.3d 782, 792 (5th Cir. 2014). However, Ricks has provided evidence that Malbroue said she wanted to be able to testify on Ricks' behalf but was afraid to testify because of Calagna's threats. The majority dismisses this affidavit because it was submitted as part of the pre-

trial motion to quash and claims it is somehow irrelevant to the argument briefed on appeal. But the affidavit is relevant to the argument briefed on appeal. Despite the government and the majority's repeated attempts to somehow sever and cure the first two threats, it is impossible to do so. Notably, Malbroue also said that "Robert had turned his life around and was not selling drugs in February 2015. Instead, he was making money as a barber, putting his drawing talents to use there as he cut designs into hair." Additionally, Malbroue said the drugs in the house actually belonged to her previous boyfriend, Pig, for whom she was holding them and to whom she had planned to return them.

The government does not dispute that Calagna told Malbroue she would be prosecuted for perjury if she testified on Ricks' behalf. Instead, the government argues that it "immunized Malbroue so that the defense could call her as a witness." But Malbroue was not immunized from anything. Not only did the immunity order contain exceptions for the very charges Calagna repeatedly threatened, but Calagna repeated the threat during trial. Despite both the majority's and the district court's characterizations, this is not about Malbroue seeking a license to perjure herself. This is about the government threatening her repeatedly by telling her that she would be prosecuted for additional charges if she testified on Ricks' behalf because it believed she was lying, not that it had proof that she actually was lying, and because the fact that she had benefited from a plea agreement that did not include the gun charge would make her guilty of perjury. From the evidence presented at trial, it is clear that the government did not have overwhelming evidence of Ricks' guilt. Moreover, it would be highly improper for the government to use a plea deal as a threat for future prosecution. No defendant would insist that the government, or in this case the state, allow him or her to plead to additional charges. The fact that the state and federal government deals or beliefs did

28

not align is not the fault of Malbroue or Ricks and should not interfere with his constitutional right to call witnesses without interference and present a defense.

At bottom, Ricks and Malbroue were arrested for drugs and a gun, which was found in Malbroue's dresser in a house owned by her parents. Authorities offered Malbroue a deal wherein she only had to plead guilty to state drug charges. Then federal authorities went after Ricks for both the drugs and the gun, despite Malbroue repeatedly telling them the gun and drugs were hers. At trial, they claimed to give Malbroue immunity to testify on Ricks' behalf but threatened her that if she testified to what she had maintained the entire time – that the gun and drugs were hers, they would prosecute her federally. They reduced her to tears at one point because she believed she would lose her child. Officials also met with Malbroue without the presence of her lawyer and told her they did not want to know anything about her involvement, they just wanted her to implicate Ricks.

Authorities did not make any buys from Ricks. Authorities had two people they claim they saw purchase drugs from Ricks. However, one of those people, Hill, who knew Ricks from his cutting hair, consistently maintained she had not bought any drugs from Ricks, was not in possession of any of the types of narcotics discovered in the Malbroue residence and said she had stopped to see Ricks on the day in question to borrow money. It is unclear how Hill's testimony was even relevant to this case since Ricks was not charged with distribution and her testimony could not in any way connect Ricks to possession of any of the drugs or the gun found in the Malbroue residence. The other person had been high for two or three days, did not know the name of the person he bought drugs from, and had dealt with about 100 different people that weekend. Authorities also paid various other witnesses to testify regarding Ricks' prior narcotics activity. However, none of those witnesses

testified as to Ricks' possession of any drugs inside the Malbroue residence. Further, at least one key government witness explicitly contradicted the government's case by stating that Ricks never sold drugs from the Malbroue residence – testimony that was consistent with Malbroue's statement.

Authorities did not attempt to obtain fingerprints or DNA evidence from the aluminum or plastic the drugs were encased in, the gun or anything else. They did not have any DNA or prints to connect Ricks to the drugs or the gun. They also had no witnesses to connect Ricks to the gun.  However, what they did have was Malbroue telling them the drugs and gun were hers and why she obtained a gun.  Malbroue had previously been arrested with crack cocaine, heroin and an AK-47 with Pig in June of 2014.  It is unclear whether Malbroue pleaded guilty to the gun charge in that case, but she pleaded guilty to the narcotics.  Officers took no notes regarding the surveillance.  Officers also had no evidence that the drugs did not belong to Malbroue and Pig.  Malbroue and Pig were still in contact, as evidenced by phone records and Malbroue's statements regarding her plans to return the drugs to Pig.  Malbroue wanted to testify on Ricks' behalf but feared she would be prosecuted based on Calagna's repeated threats.

For all of these reasons, I conclude that the government substantially interfered with Ricks' right to call Malbroue as a witness and present a defense.  Further, this constitutes clear error.

**\* *Continuance***

Just before trial, the government disclosed that Officer Long, who had conducted the surveillance, had been diagnosed with a brain tumor affecting her vision just two months after the surveillance and had brain surgery shortly thereafter.  Further, the government disclosed that there had been numerous other young black men investigated for similar drug dealing in the same area at the same time.  Ricks asked for and was denied a continuance for additional

time to investigate Long's medical condition and the effect it had on any identification.

The majority concludes that Ricks is unable to demonstrate prejudice, in part, because Ricks' "charges were unrelated to Officer Long's identification because he was not charged with the distributions observed during the surveillance" conducted by Long. I disagree. Other than drugs being found in a room shared by Malbroue and Ricks in the Malbroue residence, the government's strongest evidence connecting Ricks to any drugs during the time period in question was Long's testimony that she believed she saw Ricks engaged in hand-to-hand drug transactions in the street. Of the individuals stopped following Long's observations, one admitted meeting with Ricks and attempting to borrow money, but denied she had purchased any drugs and, in fact, was not in possession of any drugs of the type found in the Malbroue residence. The other individual, who had been high and awake for two or three days and had dealt with approximately 100 dealers that weekend, did not know the name of the person he had met with and said it was "a little black dude." Upon additional questioning, this witness said he did not recall a name, but eventually said one of the guys who worked the corner was named "R." The witness also testified that he only knew this person by "R" and did not know any other name until authorities told him they had him on video purchasing drugs from Ra-B. Again, no such video ever existed. Also, the government has presented no evidence that Ricks ever went by "R."

Beyond that evidence, the only other testimony was that of paid informants and drug dealers/users who claimed they had purchased drugs from Ricks at some point in the past unrelated to this investigation. These same witnesses were unable to explain discrepancies in their testimony. Additionally, as stated previously, authorities did not attempt to obtain fingerprints or DNA from any packets of drugs, the gun, or any other items.

Thus, Long's testimony was crucial and formed the basis for the entire case. Further, the positions of the government and the majority on this would beg the question of why all of this evidence was allowed to be introduced when Ricks was not even charged with distribution and it was supposedly so unnecessary to his conviction for possession that it would not matter if it was wrong.

As the majority states, this court reviews a district court's denial of a continuance for an abuse of discretion. *United States v. Porter*, 907 F.3d 428, 439 (5th Cir. 2009). In determining whether a district court abused its discretion, this court looks to the totality of the circumstances. *United States v. Stalnaker*, 571 F.3d 428, 439 (5th Cir. 2009). The totality of the circumstances includes:

> (a) the amount of time available;
> (b) the defendant's role in shortening the time needed;
> (c) the likelihood of prejudice from denial;
> (d) the availability of discovery from the prosecution;
> (e) the complexity of the case;
> (f) the adequacy of the defense actually provided at trial;
> and (g) the experience of the attorney with the accused.

*Stalnaker*, 571 F.3d at 439.

Here, the government did not disclose this information until just a few days before trial. Ricks had no role in shortening the time needed. The likelihood of prejudice from an erroneous identification was significant. While Ricks was able to cross-examine Long on her medical issue, he did not have time to do additional discovery or independent investigation regarding the likelihood of whether she was having vision problems at that time, whether her vision problems had affected other NOPD cases, or whether the fact that the surveillance occurred at night could have exacerbated any problems, among other things. Long's brain tumor was so serious that she was still

32

suffering from vision problems and on disability at the time of trial. When all of this is combined with the facts that Malbroue consistently stated that the drugs and guns were hers, that multiple other people, including many who looked similar to Ricks and some who also had the same or similar names, were selling drugs in the same area at the same time, and the lack of "utterly overwhelming" evidence in this case, I conclude that the district court abused its discretion in refusing to grant a continuance.

### * *Jail calls*

Over objection, Calagna also testified about some of the hundreds of jail telephone calls he listened to as part of his investigation. Some of these phone calls involved Armand Matthews, also known as "Butter." Specifically, Calagna testified about a phone call from Butter to an individual named Sterling Adams, also known as "Apple." A recording of the phone call was played before the jury and the government interpreted it as Butter telling Apple, "Go around Belleville tell that boy Ra-B I said give you the 500." However, the caller does not spell Ra-B and there's no indication he's not saying Robbie or Robie. Additionally, the government referenced other calls where they believed the name could only be Ra-B.

On cross-examination, Ricks' counsel asked Calagna whether he had also reviewed any of Ricks' jail telephone calls, and Calagna said that he had. Ricks' counsel then stated that he had "never been provided any jail calls." Counsel further argued that "this is basic fundamental Rule 16 discovery. If there are statements from Mr. Ricks, I'm entitled to receive those. If they're inculpatory, I certainly need to know them; if they're exculpatory, I certainly need to know them, but I've not been provided anything of that sort." Ricks' counsel also argued, "[a]nd I don't know, I haven't heard them, but I suspect what he probably said was he didn't have anything to do with these drugs, and

33

if that's the case, that's certainly Brady evidence that the government would have had to turn over."

The government responded that, although authorities were able to log in and listen to the jail calls and had possession of any that were favorable to the government, they did not have possession of any other jail calls. The district court then overruled Ricks' objection and concluded there was no discovery violation. The court also said that the defense could have subpoenaed Ricks' calls and made the statement that "[t]he government isn't using them, and doesn't have them."

The majority states that Ricks cannot demonstrate an abuse of discretion on the part of the district court under Rule 16 because he fails to assert that the records were "relevant" to any issue at trial. The majority then states that, for that reason, it need not resolve the issue of whether the records were in the Government's possession, custody or control. However, I disagree.

While there is certainly an argument that the defense could not possibly have known whether the calls were relevant without having reviewed the calls, there is also an argument that any calls that were relevant for purposes of government review were also relevant to the defense. Moreover, the defense could not show the error was sufficiently prejudicial to warrant reversal without having reviewed the calls. The majority's attempt to substitute Ricks' knowledge of any of his own calls for the professional judgment of his counsel in determining relevancy or prejudice is improper. Additionally, Ricks did not know Calagna had also reviewed Ricks' jail calls until he was asked at trial.

Regarding recorded statements, Rule 16 of the Federal Rules of Criminal Procedure provides in relevant part that:

> Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:

(i) any relevant written or recorded statement by the defendant if:
- the statement is within the government's possession, custody, or control; and
- the attorney for the government knows--or through due diligence could know--that the statement exists.

Fed. R. Crim. P. Rule 16(a)(1)(B)(i).

Here, the government knew the statements existed and had been reviewed. Any argument that the statements were not within the possession, custody, or control is disingenuous. While the telephone system may be maintained by the parish, the government admitted at trial that it had the capability to log in, review any and all calls it deemed relevant, obtain recordings of those calls, and introduce them as evidence at trial. Clearly this puts the statements within the control of the government. Rule 16 requires possession, custody, *or* control. (Emphasis added). Further, despite the district court's statement to the contrary, there is no requirement in this subsection that the government actually be using all of the recordings at trial.

The majority also concludes that "any claim of resulting prejudice fails given the 'overwhelming' trial evidence demonstrating Ricks' guilt." However, as stated previously, there is far from any "overwhelming" evidence of guilt here. Thus, I would conclude that the district court abused its discretion in not requiring the government to permit access to the recordings of Ricks' calls.

## CONCLUSION

Because I would conclude that the government substantially interfered with Ricks' ability to call witnesses and present a defense, which constitutes clear error, and that the trial court abused its discretion in denying a continuance and in not requiring the government to permit access to Ricks' telephone calls Calagna had reviewed, I would vacate and remand. Therefore, I respectfully dissent.